IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MARIO ALBERTO MEDRANO, | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. H-02-2976 |
| TOMMY THOMAS, ET AL., | § § § | |
| Defendant. | § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

Plaintiff Mario Alberto Medrano complains of defendants Tommy Thomas, Fred Petruska, Craig Miller, Michael Sams, Jerry Gideon, Gary Slot, and Craig Full.

### Jurisdiction

1.   The Court has jurisdiction over this action because it involves a federal question – whether officers acting under color of state law violated Mr. Medrano's Constitutionally-guaranteed rights and privileges.  The Court has supplemental jurisdiction over Mr. Medrano's state law allegations.  In the alternative, the Court has jurisdiction because Mr. Medrano is a citizen of Mexico and the defendants are American citizens.

### Venue

2.   Venue is proper in the Houston Division of the Southern District of Texas because the events giving rise to this action occurred in Harris County, Texas.

### Parties

3.   Plaintiff Mario Alberto Medrano is a citizen of Mexico.  He is currently incarcerated in the Polunsky Unit of the Institutional Division of the Texas Department of Criminal Justice in Livingston, Texas.

4. Defendant Tommy Thomas is the sheriff of Harris County, Texas, and is a resident of Harris County. He has been served and has appeared in this action.

5. Defendant Fred Petruska is a sergeant in the Harris County Sheriff's Department and a resident of Harris County, Texas. He has been served and has appeared in this action.

6. Defendant Craig Miller is a deputy in the Harris County Sheriff's Department and a resident of Harris County, Texas. He has been served and has appeared in this action.

7. Defendant Michael Sams is a deputy in the Harris County Sheriff's Department and a resident of Harris County, Texas. He has been served and has appeared in this action.

8. Defendant Jerry Gideon is a deputy in the Harris County Sheriff's Department and a resident of Harris County, Texas. He has been served and has appeared in this action.

9. Defendant Gary Slot is an officer in the Baytown Police Department and a resident of Harris County, Texas. He may be served with process at his place of employment, Baytown Police Department, 3200 North Main Street, Baytown, Texas, 77521.

10. Defendant Craig Full is an officer in the Houston Police Department and a resident of Harris County, Texas. He may be served with process at his place of employment, Houston Police Department, 1200 Travis, Houston, Texas, 77002.

### Background

11. Mr. Medrano brings this suit to recover for his injuries suffered through the defendants' assault, battery, and deprivation of his civil rights.

12. Mr. Medrano's civil rights were violated when he was permanently injured in the course of an arrest through the defendants' excessive use of force. After Mr. Medrano had surrendered his weapon, surrendered to the officers, and was prone on the ground, the arresting officers repeatedly kicked him in the face. This intentional beating additionally constituted assault and battery.

13. After Mr. Medrano's arrest but before his trial on the charges stemming from that arrest, the defendants erased the portions of a video recording that showed them repeatedly kicking Mr. Medrano in the face. This illegal deletion violated Mr. Medrano's civil rights by depriving him of evidence that could have been used at trial as mitigation or exculpation.

**Allegations**

14. Messrs. Petruska, Gideon, Miller, Sams, Slot, and Full were members of the Harris County Organized Drug Task Force and were under the ultimate direction, supervision, and control of Mr. Thomas. Messrs. Petruska, Miller, Gideon, Sams, Slot, and Full are occasionally referred to as the Task Force members.

15. The Task Force set up a "buy-bust" to occur on August 11, 2000, in a La Quinta Inn near Greenspoint Mall in Harris County, Texas. The Task Force rented at least two rooms at the La Quinta.

16. In the first room were an undercover member of the Task Force and a confidential informant, posing as purchasers of illegal drugs. A disguised video camera was installed in this room so that the drug purchase could be recorded and used as evidence in prosecutions arising out of the operation. Additional members of the Task Force occupied an adjoining room.

17. The Task Force was expecting traffickers to arrive with the intention of selling drugs to the undercover deputy and the confidential informant. Instead, Noe Lopez and his accomplice, Mr. Medrano, entered the first room seeking the drug purchasers' money. They did not know that the "purchasers" were an undercover deputy and a confidential informant or that the drug sale was an undercover law enforcement operation. A firefight ensued.

18. The undercover deputy was injured while taking cover in the hotel room's bathroom. Following the initial exchange of gunfire, Mr. Medrano also took cover in the bathroom. During this time, no additional shots were fired.

19. The initial exchange of gunfire alerted the Task Force members in the adjoining room that the operation had gone awry and that their comrades in the first room required assistance. After Lopez brandished his weapon at the reinforcing Task Force members, they opened fire, accidentally shooting the confidential informant. The Task Force members opened fire again when Lopez fled the room and attempted to escape by vaulting from the second-floor balcony of the hotel. Lopez was killed.

20. After determining that Lopez was no longer a threat to others' lives or safety, the Task Force members entered the first room. Hearing this, Mr. Medrano exited the bathroom, told the officers not to shoot, and dropped his weapon. Though hobbled by his poor command of English, Mr. Medrano followed the Task Force members' instructions and knelt on the hotel floor with his torso laying against a bed. A member of the Task Force ordered Medrano not to move, cursed loudly at him, and placed his revolver to the back of Mr. Medrano's head.

21. After Mr. Medrano had knelt down, a Task Force member entered the bathroom to ascertain the undercover deputy's status. The Task Force member found the deputy to be injured.

22. Angered by the injury to the undercover deputy, the Task Force members forced Mr. Medrano to the hotel floor and kicked him repeatedly in the face. The Task Force members also assaulted the confidential informant before realizing that he was not one of the perpetrators of the robbery attempt.

23. Mr. Medrano was taken to Ben Taub Hospital for treatment of his injuries. He was missing four teeth and suffering from a concussion. His jaw was broken in two places.

24. On August 25, 2000, Mr. Medrano had surgery to repair his injuries. Doctors inserted artificial teeth into his mouth. To repair the damage to his mandible and align his bones, they inserted a permanent metal rod into his jaw.

25. As a result of his injuries, Mr. Medrano was placed on a liquid diet. He continues to suffer pain from nerve damage and can no longer eat meats or other chewy foods. In addition, he has been physically disfigured and suffers from mental distress. He will continue to suffer mental distress and physical pain in the future.

26. While being questioned by officers, Mr. Medrano was shown a copy of the video recording of the incident leading to his arrest. The video recording clearly showed Task Force members kicking him in the face. In the course of their investigation of the Task Force members' conduct during the August 11 incident, internal affairs officers showed others copies of the videotape that clearly showed Task Force members kicking Mr. Medrano in the face.

27. When the videotape was shown at trial, it did not include portions of the recording showing Mr. Medrano being kicked in the face. The Task Force members erased or caused to be erased the portions of the videotape that showed Mr. Medrano being kicked in the face.

28. Mr. Medrano now sues to recover damages for the wrongs that the defendants have inflicted.

## Claims for Relief

**Violation of Civil Rights Under Color of Law Through Use of Excessive Force**

29. The Constitution guarantees Mr. Medrano's right to be free from the use of excessive force during an arrest. The Task Force members deprived Mr. Medrano of this right while acting under color of state law as members of the Task Force. Kicking Mr. Medrano in the face was unnecessary, unreasonable, and excessively violent. The Task Force members' failure to intervene to prevent or halt their fellow Task Force members from kicking Mr. Medrano in the

face was similarly unnecessary and unreasonable. As such, the Task Force members are liable for the deprivation of Mr. Medrano's civil rights under color of state law.

**Violation of Civil Rights Under Color of Law Through Destruction of Relevant Evidence**

30. The Constitution guarantees Mr. Medrano's right to exculpatory and mitigating evidence and bars the destruction or withholding of such evidence by officers of the state. The Task Force members, acting under color of state law as members of the Task Force, erased those portions of the recording that showed Mr. Medrano being kicked in the face. This videotaped evidence of abuse was admissible during the punishment phase of Mr. Medrano's criminal trial but was unavailable as a result of the Task Force members' actions. The destruction of relevant portions of that recording was unreasonable, unnecessary, and deprived Mr. Medrano of his Constitutional right to have that evidence and to present it to the jury, making the Task Force members liable for the deprivation of Mr. Medrano's civil rights under color of state law.

**Conspiracy to Violate Civil Rights Under Color of Law Through Destruction of Relevant Evidence**

31. The Task Force members combined and agreed to accomplish an unlawful purpose – destruction of portions of the videotape depicting the excessive force used against Mr. Medrano during his arrest. This destruction was accomplished by members of the conspiracy and, as described in paragraph 30, deprived Mr. Medrano of his right to have relevant evidence and present that evidence to an impartial jury in arguing his sentence.

**Aiding and Abetting the Violation of Civil Rights Under Color of Law Through Use of Excessive Force and Destruction of Relevant Evidence**

32. The Task Force members encouraged and assisted others, including each other, in the violation of civil rights described in paragraphs 30 and 31. As such, they are vicariously liable for the deprivation of Mr. Medrano's rights as described in those paragraphs.

**Negligence Per Se Through Tampering With Physical Evidence and Governmental Records**

33.     The video recording of Mr. Medrano's arrest is physical evidence and a government record. Sections 37.09 and 37.10 of the Texas Penal Code make it illegal for a person to alter, destroy, or conceal such evidence; present falsified evidence with the intent of affecting the course or outcome of an investigation or proceeding; or intentionally destroy or impair the verity of such evidence.

34.     These statutes are intended to protect the rights of litigants during criminal proceedings, such as Mr. Medrano, by guaranteeing the integrity of evidence and government records that are considered by investigators and presented at trial to determine the guilt of the accused and the punishment to be imposed on the guilty.

35.     Without excuse, the Task Force members violated these statutes by altering and destroying the videotaped evidence of the abuse of Mr. Medrano during his arrest and by concealing this alteration and presenting the altered and destroyed recording as an unblemished recording of the events surrounding Mr. Medrano's arrest. In the alternative, the Task Force members encouraged or assisted others in this alteration, destruction, and concealment. As such, the Task Force members are liable for negligence per se.

**Violation of Civil Rights Under Color of Law Through Lack of Training and Supervision**

36.     Mr. Thomas was responsible for the supervision and training of the other defendants through his position as Sheriff of Harris County and titular head of the Task Force.

37.     Mr. Thomas did not properly train the Task Force members in procedures relating to arrests, use of force, and handling of evidence, nor did he properly supervise the Task Force members during their operations. Mr. Thomas's improper training and supervision amounted to deliberate indifference toward Mr. Medrano's rights, and the result of this improper training and

supervision was the deprivation of Mr. Medrano's civil rights by the defendant Task Force members as described in this complaint.

**Violation of Civil Rights Under Color of Law Through Negligent Hiring and Assignment**

38.   It was plainly obvious from adequate scrutiny of the Task Force members' backgrounds that one of the consequences of placing them on the Task Force would be the deprivation of constitutional rights through the use of excessive force or the destruction of relevant evidence. Mr. Thomas's negligent hiring and assignment of these defendants for the Task Force is a proximate cause of the deprivation of Mr. Medrano's rights as described in this complaint, and Mr. Thomas is thus liable for those violations of Mr. Medrano's rights.

**Assault**

39.   The Task Force members intentionally kicked Mr. Medrano in the face, or aided and encouraged others, including each other, to kick Mr. Medrano in the face. The kicking caused Mr. Medrano bodily harm for which the Task Force members are liable.

**Intentional Infliction of Emotional Distress**

40.   The Task Force members intentionally kicked Mr. Medrano in the face, or aided and encouraged others, including each other, to kick Mr. Medrano in the face. This kicking was extreme and outrageous, and part of the Task Force members' intent was to cow Mr. Medrano and cause him severe emotional distress. As a result of the Task Force members' actions, Mr. Medrano suffered, and continues to suffer, severe emotional distress.

**Damages**

41.   The defendants' actions as alleged above injured Mr. Medrano, and he seeks to recoup damages as recompense for the injuries the defendants inflicted. These include, without limitation, damages for past and future pain and suffering, past and future mental anguish, past and future physical impairment, physical disfigurement, and past medical expenses.

42. Because the defendants' conduct was malicious, reckless, and showed a callous indifference to Mr. Medrano's civil rights, he is entitled to punitive damages.

43. Because he has been forced to bring suit to vindicate his federal rights, Mr. Medrano seeks an award of attorneys' fees. 42 U.S.C. § 1988.

44. Mr. Medrano seeks pre- and post-judgment interest on all damages awarded.

## Jury Demand

45. Mr. Medrano demands a trial by jury on all contested issues of fact.

## Conclusion and Prayer

Mario Alberto Medrano prays that, after trial of this action, the defendants be held liable; judgment be entered against the defendants; and that he recover from the defendants actual and punitive damages, pre- and post-judgment interest, costs of court, and attorneys' fees. Mr. Medrano further seeks all other relief to which he may be entitled.

Respectfully submitted,

By: /s/ Wade B. Johns
Wade B. Johns
State Bar No. 24036848
Federal I.D. No. 34316
Leif A. Olson
State Bar No. 24032801
Federal I.D. No. 33695
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
Telephone: (713) 651-5151
Facsimile: (713) 651-5246

OF COUNSEL:
FULBRIGHT & JAWORSKI L.L.P.

COUNSEL FOR PLAINTIFF
MARIO ALBERTO MEDRANO

## CERTIFICATE OF SERVICE

This pleading, Plaintiff's First Amended Complaint, was served in compliance with Rule 5 of the Federal Rules of Civil Procedure on May 2, 2005, in the manner indicated below.

Mary E. Baker
Assistant County Attorney
1019 Congress, 15th Floor
Houston, Texas  77002
**By Certified Mail, RRR**

_____
Wade B. Johns